**SPUR BOTTLING CO. v. CANADA DRY GINGER ALE, Inc.**

Civ. No. 925.

United States District Court
W. D. Arkansas, Fort Smith Division.

July 17, 1951.

Hugh M. Bland, Fort Smith, Ark., for plaintiff.

Harry P. Daily (of Daily & Woods), Fort Smith, Ark., for defendant.

JOHN E. MILLER, District Judge.

A motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A., has been filed by the defendant and written briefs in support of and in opposition to the motion have been filed by the attorneys for the respective parties.

The motion alleges "that there is no genuine issue as to any material fact and that defendant is entitled to a judgment as a matter of law." It is further alleged that the motion is based upon (a) the pleadings, (b) the admissions on file set forth in pretrial conference order of January 22, 1951, and (c) the admissions on file set forth in stipulation signed by respective attorneys for plaintiff and defendant.

Rule 56(b) provides that a party against whom a claim is asserted may, at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part of the claim.

In Subsection (c) of the Rule it is provided: "The judgment sought shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages."

In Ramsouer v. Midland Valley Railroad Company, 8 Cir., 135 F.2d 101–105–106, the court said: "the issue to be tried on a motion for summary judgment is whether or not there is a genuine issue as to any material fact, and not how that issue should be determined. In considering such a motion as in a motion for a directed verdict, the court should take that view of the evidence most favorable to the party against whom it is directed, giving to that party the benefit of all favorable inferences that may reasonably be drawn from the evidence. If, when so viewed, reasonable men might reach different conclusions, the motion should be denied and the case tried on its merits."

In Sartor v. Arkansas Natural Gas Corporation, 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967, the Supreme Court held that the rule authorizes summary judgment only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is, and that no genuine issue remains for trial. It is not the purpose of the rule to cut litigants off from their right of trial by jury if they really have issues to try.

No affidavits have been filed by either party and the question whether a genuine issue as to any material fact exists must be determined upon the pleadings, with their exhibits, and the admissions of the parties made at a pre-trial conference and the facts set forth in the stipulations signed by the respective attorneys and filed herein.

The record, consisting of the above, discloses the uncontradicted facts to be as follows:

(1) The original complaint was filed on September 29, 1950. The answer to that complaint was filed November 8, 1950.

(2) The plaintiff is a corporation organized under the laws of the State of Arkansas with its principal place of business in the City of Fort Smith in said State.

The defendant is a corporation organized under the laws of the State of Delaware

and on all dates material herein was engaged in business in the State of Arkansas.

The amount in controversy exceeds in value the sum of $3,000.00, exclusive of interest and costs.

On February 20, 1939, Barq's Bottling Company was organized as a corporation under the laws of Arkansas with its principal place of business in Fort Smith in said State. On April 14, 1947, an Amendment to the Articles of Incorporation was duly executed and filed by which the name of the corporation was changed to Spur Bottling Company.

(3) On August 27, 1947, the plaintiff and defendant entered into a distributorship agreement whereby the defendant appointed the plaintiff as exclusive distributor for Canada Dry beverages in certain designated territories. That contract was canceled on January 17, 1949, and was superseded by another contract to become effective as of December 1, 1948. The contract which became effective on December 1, 1948, is evidenced by a letter, a copy of which is attached to the original complaint. Under the terms of the letter-contract, the plaintiff was appointed as distributor for Canada Dry beverages in the territory described in a license agreement existing between the parties and the distributorship was subject to the conditions set forth in the letter-contract. Briefly, those conditions were that the distributorship should cover only the products and sizes which the defendant should advise the plaintiff from time to time were available for sale in the territory. All orders for merchandise and payments therefor were to be sent to the defendant at its Dallas, Texas, Office. Provisions were made as to prices to be paid and the time of payment therefor. There was no stipulation that the plaintiff should purchase any specific amount of merchandise from the defendant but generally it was provided that the plaintiff would distribute the products of the defendant and account for all bottles and material furnished the plaintiff by the defendant.

The letter-contract contained the following agreement:

"In the event that this agreement shall be terminated for any reason other than commencement of operations as a licensed bottler, then you shall return to us all reusable empty bottles and cases which you have in inventory and we shall refund to you the amount of deposits which you shall have paid thereon. You shall also return any full goods which you may have in inventory and we shall refund to you the price at which they were originally billed to you.

"The distributorship agreement shall be terminated by either party upon ten (10) days' written notice to the other or, in the event that our license agreement with you should be terminated or canceled for any reason whatsoever, this agreement shall be deemed automatically terminated."

Under this letter-contract the plaintiff worked the territory with specially built and equipped trucks, bearing appropriate advertising thereon, and devoted all of its time to the business of manufacturing and selling bottled Canada Dry products and building up the good will for the defendant's products in the territory covered by the distributorship agreement and license agreement hereinafter mentioned, and was so engaged at the time the distributorship agreement and license agreement were terminated by the defendant.

(4) Subsequent to the filing of the answer the case was set for trial on January 29, 1951, but, prior to that date and on January 22, a pre-trial conference was held. At that conference the issues in the case were discussed and it was admitted by the plaintiff that the contract upon which it bases its claim is evidenced by the letter dated January 17, 1949, addressed to it and written by the defendant and attached to the complaint as Exhibit "A". Thereupon it was admitted by all the parties that Exhibit "A" is a correct copy of the original contract and that, acting pursuant to the terms of the contract, the defendant by letter dated June 20, 1950, gave notice to plaintiff of the termination of said contract effective ten days from date of its receipt by plaintiff and that said letter was received by plaintiff on June 22, 1950; and that the said ten day period expired at midnight, July 2, 1950.

(5) In the original complaint the plaintiff alleged that the defendant on or about June 1, 1950, breached the contract by licensing and permitting other distributors to serve customers of the plaintiff in its territory at prices less than those charged by plaintiff and that the defendant, without reasonable or probable cause and wholly in disregard of plaintiff's vested rights, terminated said distributorship agreement; that, as a result of the wrongful termination of said contract by the defendant, the value of plaintiff's investment in specialized production equipment, racks, advertising material and automotive equipment and the investment of its time, effort and management skill had been destroyed to the damage of the plaintiff in the sum of $200,000.00.

In the answer filed by defendant, it alleged that it had terminated the letter-contract in accordance with the terms thereof by letter mailed to the plaintiff on June 20, 1950; that the letter was received by the plaintiff on June 22, and that the termination of the contract became effective ten days from receipt of the letter by the plaintiff.

The defendant denied that it had on or about the 1st of June, 1950, breached the contract with the plaintiff by licensing other distributors to serve customers of the plaintiff or that it had terminated the distributorship without reasonable or probable cause. The defendant further denied that the plaintiff had any vested rights to have the contract continued and that notice of a termination was properly given to the plaintiff and that it was justified in giving the plaintiff said notice.

The defendant admitted that in the early part of June, without authorization from it, its Little Rock jobber sold and delivered in plaintiff's territory 10 cases of Canada Dry beverages and that, during the ten days' period prior to the effective date of the termination of plaintiff's distributorship agreement, the newly appointed distributor in Fort Smith, contrary to instructions which it had received from the defendant, sold in the Fort Smith territory 359 cases of Canada Dry products.

The defendant also asserted a cross-claim in the sum of $165.64 for goods, wares and merchandise sold and delivered to the plaintiff and asked for judgment against the plaintiff in the said sum of $165.64.

The plaintiff filed a reply to the answer and counterclaim in which it admitted that it owed the defendant the sum of $165.64 on account, and tendered said sum into court subject to the orders of the court.

The allegations in the complaint and answer concerning the sale in the plaintiff's territory by other licensees and distributors were determined by stipulation executed by the parties and filed herein on January 23, 1951, which stipulation is as follows:

"1. Prior to July 3, 1950, the Little Rock jobber of Canada Dry Ginger Ale, Inc. sold ten cases of Canada Dry products, in the City of Fort Smith, Arkansas.

"2. After June 20, 1950 and prior to July 3, 1950, R.M.B. Produce Company sold 359 cases of Canada Dry products, in the City of Fort Smith, Arkansas.

"3. The profit which Spur Bottling Company made a case during this period was twenty-five cents (25¢) per case.

"4. The plaintiff does not complain that there were any other sales made by others in the territory covered by the contract identified as Exhibit A to the complaint."

(6) Following the pre-trial conference of January 22, 1951, where the question of liability of the plaintiff to the defendant on the contract sued upon was fully discussed, the defendant on March 28, 1951, filed its motion for summary judgment, and the court requested the parties to submit briefs thereon. These briefs were not submitted until recently and, in the meantime, on April 5, 1951, the plaintiff filed an amended complaint which, after adopting the allegations of the original complaint concerning the breach of the distributorship agreement by the defendant, the plaintiff alleged that on November 13, 1940, the defendant entered into an exclusive license agreement with Barq's Bottling Company to manufacture, bottle, sell and distribute Canada Dry

Spur in certain territory therein designated; that, when the name of the plaintiff corporation was changed from Barq's Bottling Company to the Spur Bottling Company, the latter proceeded to comply with all the terms of said license agreement until it was breached by the defendant on or about June 1, 1950, and later terminated by the defendant on August 22, 1950.

That on July 21, 1947, the defendant licensed the plaintiff to manufacture, bottle, sell and distribute Canada Hi-Spot in certain territories designated in the license agreement and that plaintiff complied with all the terms of this agreement until the same was breached on or about June 1, 1950, and later terminated by the defendant on August 22, 1950.

The plaintiff renews its prayer for judgment for damages for the alleged wrongful termination of the distributorship agreement and the license agreements.

On April 12, 1951, the defendant filed its answer to the amended complaint in which it denied that it had breached the license agreements and alleged that the license agreement specifically provided that it was granted and accepted for a term of one year beginning at the date thereof and that "at the expiration of the said term, this Agreement shall continue in full force and effect for an indefinite period thereafter, subject to termination pursuant to the provisions herein set forth and subject to the right of either party to terminate it at any time upon sixty (60) days' prior written notice. It is mutually understood and agreed, however, that such termination of this Agreement shall not release either party from any liability arising hereunder prior to such termination."

The defendant further denied that the plaintiff had complied with all the terms of the license agreement, and alleged certain violations thereof by the plaintiff.

Both license agreements, that is the one that was entered into by the defendant with Barq's Bottling Company on November 13, 1940, and the one entered into with the plaintiff on July 21, 1947, contain the provision hereinbefore set forth concerning the termination of said agreements.

However, the allegations in the amended complaint and in the answer thereto, insofar as the license agreements are concerned, were resolved by the parties executing and filing herein a stipulation, as follows:

"It is stipulated and agreed:

"1. That the original corporate name of plaintiff was Barqs Bottling Company, and that by Amendment to its Articles of Incorporation, filed in April 1947, plaintiff's corporate name was changed to Spur Bottling Company.

"2. That on August 22, 1950, defendant mailed to plaintiff the following letter:

'August 22, 1950

Spur Bottling Company of Fort Smith
200 Wheeler Avenue
Fort Smith, Arkansas

Gentlemen: Re: Spur and Hi-Spot License Agreements Fort Smith, Arkansas

Please be advised that we have elected to terminate our Spur License Agreement and Hi-Spot License Agreement, dated November 13, 1940 and July 21, 1947, respectively, as amended, and that pursuant to the provisions of Article 1 thereof, such termination will become effective sixty (60) days after the receipt of this notice by you.

In accordance with the provisions of Article 14 of the said license agreements, will you kindly return to us your executed copy or copies of the said license agreements and all formulae, exhibits, amendments and supplements attached thereto or furnished to you.

Very truly yours,
Canada Dry Ginger Ale, Incorporated
Wm. J. Williams,
Vice-President and Secretary
WJW:EBH
Registered Mail
Return Receipt Requested'

and that said letter was received by plaintiff on or about August 26, 1950."

The provisions of both licensing agreements are similar and by their terms authorized the plaintiff to manufacture, bottle, sell and distribute in the territory therein described Canada Dry Spur and

Canada Dry Hi-Spot in accordance with certain formulae to be furnished by the defendant and from materials to be sold by the defendant to the plaintiff. The plaintiff was required to furnish its bottling plant and equipment and to conduct the same under sanitary conditions and in a manner satisfactory to the defendant. Likewise, the plaintiff agreed to buy from the defendant and the defendant agreed to sell to the plaintiff Canada Dry extracts and other ingredients for the manufacture of such products; the plaintiff was to proceed in strict conformity with instructions and specifications to be furnished by the defendant and all advertising was to be under the control of the defendant.

The plaintiff was required to exercise its best efforts to promote the sale of such beverages in the assigned territory and to install and operate an efficient delivery service and to otherwise service all the licensed territory in the manner and to the extent necessary properly to supply and develop the demand for Canada Dry beverages therein.

As heretofore stated, the facts set forth above in Paragraphs numbered 1 to 7, both inclusive, are uncontradicted. There appears in the original complaint, which was based upon the distributorship agreement that became effective December 1, 1948, the following allegation: "On or about the 1st day of June, 1950, the defendant breached said contract with the plaintiff, by licensing and permitting other distributors to serve customers of this plaintiff in its territory at prices less than those charged by plaintiff and systematically and designedly commenced to undermine and discredit plaintiff in its territory. Made unusual and unnecessary requirements of plaintiff, and when plaintiff complained of the conduct of the defendant, said defendant, without reasonable or probable cause, and wholly in disregard of plaintiff's vested rights, terminated said distributorship agreement on the 22nd day of August, 1950."

The answer to the original complaint denies this allegation and alleges that the distributorship agreement was terminated by registered mail, dated and mailed June 20, 1950, effective ten days after receipt of said letter by plaintiff, and that said letter was received by plaintiff on the 22nd day of June, 1950.

The date and the manner of the termination of the distributorship agreement was agreed upon at the pre-trial conference as set forth in the order of the court based on such agreement on January 22, 1951, and the only possible question in dispute under the allegations of the original complaint and the answer thereto is whether the defendant systematically and designedly commenced to undermine and discredit plaintiff in the assigned territory and whether defendant made unusual and unnecessary requirements of plaintiff and whether the distributorship agreement was terminated by defendant without reasonable or probable cause and in disregard of plaintiff's vested rights. In other words, the parties are not in agreement on whether defendant had the right to terminate the agreement and whether the plaintiff had any vested rights under the contract which would prevent the defendant from terminating the distributorship agreement in the manner in which it did. The only possible question that is raised by the amended complaint upon which the parties are not in agreement as to the facts is that the plaintiff alleges that it complied with all the terms of the license agreements and that the defendant breached the agreements on or about the 1st of June, 1950.

In the answer to the amended complaint the defendant denies that it breached the license agreements in any manner and alleges that in June, 1950, and prior thereto the plaintiff, in direct violation of the license agreements, bottled in bottles bearing the trade name and trade mark "Canada Dry Spur. Registered U. S. Patent Office" a chocolate milk drink which was not Canada Dry Spur and was not made from Canada Dry extracts, and sold same to the trade in bottles in the territory covered by said license agreements and that plaintiff in direct violation of the license agreements, continued this practice after being requested to desist.

As heretofore stated, the stipulation settled all questions of fact as to the time when the license agreements were termi-

978

nated and the manner in which they were terminated by the defendant.

The preliminary question confronting the court is whether there is any genuine issue as to any material fact that should be determined by a jury or the court in a trial upon the merits.

■ There is no genuine issue as to any material fact remaining in the case. All the material issues of fact are determined by the pleadings, the exhibits thereto, the pre-trial order based upon admissions of the parties at the pre-trial conference and the stipulations of the parties filed herein on January 23 and July 3, 1951.

■ The fact that plaintiff in the original complaint alleged that defendant breached its distributorship agreement by licensing and permitting other distributors to serve customers of plaintiff; that it systematically and designedly commenced to undermine and discredit plaintiff; that it made unusual and unnecessary requirements of plaintiff and that it, without reasonable or probable cause and wholly in disregard of the plaintiff's vested rights, terminated the distributorship agreement, is not material if the defendant had the legal right to terminate the agreement.

The position of the plaintiff is not strengthened by the filing of the amended complaint which dealt with the licensing agreements hereinbefore referred to.

At the time the distributorship agreement sued upon in the original complaint became effective, December 1, 1948, there was in force the two licensing agreements, the one dated November 13, 1940, in which Barq's Bottling Company was designated as the licensee and the other dated July 21, 1947, in which the plaintiff was the designated licensee.

The distributorship agreement specifically provided that it "shall be terminated by either party upon ten (10) days' written notice to the other or, in the event that our license agreement with you should be terminated or canceled for any reason whatsoever, this agreement shall be deemed automatically terminated." Both licensing agreements provided that each should continue for a term of one year from the date thereof and at the expiration of the said term the agreement should continue in full force and effect for an indefinite period thereafter, "subject to termination pursuant to the provisions herein set forth and subject to the right of either party to terminate it at any time upon sixty (60) days' prior written notice." The licensing agreements also provided such termination "shall not release either party from any liability arising hereunder prior to such termination." It will be noted that the distributorship agreement provided that it might be terminated by either party upon ten days' written notice to the other and further that, in the event the license agreement or agreements should be terminated or canceled for any reason whatsoever, the distributorship agreement was to be deemed automatically terminated. Thus when the licensing agreements were terminated, "for any reason whatsoever," the distributorship agreement was itself terminated independently of the further right of the defendant to terminate the agreement upon ten days' written notice.

The plaintiff in its brief contends that the defendant could not commit a breach of the distributorship contract or the licensing agreements and then exercise its reserved right under the contract and the licensing agreements to terminate them without just excuse or probable cause and, in support of this contention, the learned attorney for the plaintiff cites and quotes from several Arkansas cases. These cases have been examined by the court and do not appear to be decisive of the rights of the parties in the instant case. The distinction between the cases cited by the plaintiff and the instant case readily appears upon a consideration of the facts, and it would unduly extend this discussion to distinguish the cases cited from the one now before the court; but suffice it to say that the contention of the plaintiff has received careful consideration by the court.

■ In 17 C.J.S., Contracts, § 404, p. 893, it is said: "Where under the contract a party may terminate it at his option, he is not liable after termination for further transactions thereunder, but obliga-

tions which have already accrued are not affected."

In 2 Am.Jur., Sec. 49, page 45, it is said: "The right to cancel an agency contract may depend upon some reservation or stipulation in the agency contract itself. Such a reservation may in effect give the right of cancellation at the will of either party or upon the happening of some contingency or the non-performance of some express condition. Under an unrestricted reservation of a right to cancel, such a contract may be canceled at any time without subjecting the party canceling it to any claim for breach of contract."

The case of Cadillac LaSalle Company of Palm Beach, Inc., v. Claude Nolan, Inc., 118 Fla. 250, 158 So. 883, was a suit by Claude Nolan, Inc., to recover damages against the defendants "for wrongfully, unjustly, willfully, maliciously, and unlawfully conspiring with each other to deprive the plaintiff of the fruits and benefits of a business contract entered into between them." The contract was a selling agreement between Claude Nolan, Inc., and Cadillac LaSalle Company of Palm Beach, Inc., and provided: "This Agreement shall continue in force and govern all relations and transactions between the parties hereto until cancelled or terminated. Either party may cancel or terminate this agreement at any time, provided the party desiring to so terminate and cancel the same gives unto the other a written notice (by registered mail or other means of delivery) of such intention at least thirty days prior to the date of such proposed termination and cancellation."

In disposing of the contention of the plaintiff that the defendants were liable in damages for the cancellation, the court said: "In the case at bar either party could breach the contract at any time by giving the required 30 days' notice. The declaration in this case does not negative the fact that such notice was given, so under the well-supported rule that a pleading should be construed against the pleader we must assume that the notice was given, and, being so, it follows that the defendant was proceeding lawfully."

The court further said: "In the case at bar the record reveals that the defendant was acting in the exercise of a legal right when it canceled and breached the contract. This being the case, the motive which actuated the breach is immaterial. Chambers v. Baldwin, 91 Ky. 121, 15 S.W. 57, 11 L.R.A. 545, 34 Am.St.Rep. 165; Olmsted, Inc., v. Maryland Casualty Co., et al., [218] Iowa [997] 253 N.W. 804."

The case of Ford Motor Company v. Alexander Motor Company, 223 Ky. 16, 2 S.W.2d 1031, 1032, was a suit instituted by the Alexander Motor Company against the Ford Motor Company to recover damages for the alleged breach of a written contract between the parties known as a dealer's agreement. A trial by jury resulted in a verdict for the plaintiff.

The contract provided that the agreement should continue in force and govern all transactions between the parties until canceled or terminated by either party; "but it is agreed that either party shall have the privilege, with or without cause, to cancel and annul this agreement at any time upon written notice by registered mail, or personal delivery of notice to the other party, and such cancellation shall also operate as a cancellation of all unfilled retail and other orders and requisitions for all products of company which may have been received by the company from the dealer prior to the date when such cancellation is served."

The court said:

"It is a well-settled rule of law that a right to cancel a contract, incorporated or reserved therein, is a part of the contract itself, and, upon the exercise of such contractual right, all obligations under the contract cease and determine, and no liability arises from the cancellation. Louisville Tobacco Warehouse Co. v. Zeigler, 196 Ky. 414, 244 S.W. 899.

"Parties may lawfully enter into agreements like the one here involved, and the courts enforce them as written. If parties agree that the rights, duties, and obligations arising from a contractual relation shall endure only at the will or pleasure of either, the courts have no right to substitute

a different duration for such rights. Executory contracts, terminable at will, in so far as they are unexecuted at the time of termination, afford no basis for a cause of action to either party." In White Sewing Machine Company v. Shaddock, 79 Ark. 220, 95 S.W. 143, 144, the contract between the Sewing Machine Company and Shaddock provided that it should "continue in force until dissolved by mutual consent; but it may be dissolved by either party giving notice, or, in case of violation of this agreement by second party (Shaddock), the first party may cancel it without notice", and the court held that either party had the right to terminate the contract upon notice to the other.

In the case of Addressograph Company v. Office Appliances Company, 106 Ark. 536–540, 153 S.W. 804, 805, the court said: "The contract evidenced by the letters did not cover any specified period of time; but, on the contrary, appellant expressly reserved the right to withdraw the authority at any time. * * *

"The appellant had the right, therefore, to cancel the contract at any time; and the only limitation which the court can read into that power is that appellant was not to exercise the right of withdrawal in such a manner or at such time as to show bad faith, and operate as a fraud upon the rights of appellee."

The case of Willcox & Gibbs Sewing Machine Company v. Ewing, 141 U.S. 627, 12 S.Ct. 94, 97, 35 L.Ed. 882, was a suit by Ewing upon an agreement whereby Ewing was bound while the contract was in force to devote his time, attention and abilities primarily to the interests of the Company within the territory allotted to him but was not compelled to continue in the service of the Company for any given number of years or indefinitely, but was at liberty after 1875, if not before, upon reasonable notice, to surrender his position and quit its service, subject to the Company's right to buy back such orders and goods sold to him as it might select.

Ewing contended that his life, or the continuance of the company in business, was the shortest duration of the contract, provided he did his duty, but the court held that such position was untenable and said: "His appointment was made and accepted subject to the conditions expressed in the agreement. No one of those conditions is to the effect that so long as he devoted his time, attention, and abilities to the company's business he should retain his position as its exclusive vendor, within the territory named, without regard to its wishes. If the parties intended that their relations should be of that character, it was easy to have so stipulated. The only part of the contract that gives color to the theory for which the plaintiff contends is the part declaring that a violation of the spirit of the agreement 'shall be sufficient cause for its abrogation. This clause, it may be suggested, was entirely unnecessary if the parties retained the right to abrogate the contract after 1875, at pleasure, and implies that it could be abrogated only for sufficient cause, of which, in case of suit, the jury, under the guidance of the court as to the law, must judge in the light of all the circumstances. We cannot concur in this view. The clause referred to is not equivalent to a specific provision declaring, affirmatively, that the contract should continue in force for a given number of years or without limit as to time, unless abrogated by one or the other party for sufficient cause. It was inserted by way of caution, to indicate that the parties were bound to observe equally the spirit and the letter of the agreement while it was in force."

The judgment of the lower court was reversed because of its failure to instruct the jury to return a verdict for the defendant.

In Grant v. Aerodraulics Company, 91 Cal.App.2d 68, 204 P.2d 683, Loc.Cit. 686, the court said: "According to the settled rule of construction, 'the exercise of an option to terminate prevents liability for further transactions but does not affect obligations which have already accrued.'"

In an annotation appearing in 32 A.L.R., page 255, and 52 A.L.R., page 547, and 89 A.L.R., page 254, the annotator cites many cases holding that one who expressly reserves the right to cancel or terminate a contract may do so in accordance with

the terms of the contract without becoming liable as for a breach of the contract. See also, Horton v. Universal Life Insurance Company, 208 Ark. 772, 187 S. W.2d 544.

The order entered at the pre-trial conference reflects that all parties admitted that the defendant, by letter dated June 20, 1950, gave notice to plaintiff of the termination of the distributorship contract, effective ten days from the time of the receipt of the letter by plaintiff, and that said letter was received by plaintiff on June 22, 1950. The ten-day period expired at midnight, July 2, 1950. The stipulation of the parties entered into on July 3, 1951, discloses that the defendant mailed to plaintiff on August 22, 1950, a letter terminating the licensing agreements and that the letter was received by plaintiff on August 26, 1950. In other words, the effective date of the termination of the distributorship agreement was July 3, 1950, and the effective date of the termination of the licensing agreements was sixty days after August 26, 1950, or October 26, 1950.

■ Since the defendant had the legal right to terminate the distributorship contract and licensing agreements, the only thing that the plaintiff can recover is the profit that it would have made between notice of the termination and the effective date thereof. The plaintiff was entitled to make all sales in the territory or to a commission on the sales of the defendant's products in the assigned territory prior to the effective date of the termination of the contract and the licensing agreements, and the stipulation of January 23, 1951, shows that the only time the territory of the plaintiff was invaded prior to the effective date of the termination of the distributorship agreement and the license agreements occurred prior to July 3, 1950, at which time the Little Rock jobber of the defendant sold ten cases and the R. M. B. Produce Company of Fort Smith sold 359 cases of the products of the defendant, making a total of 369 cases of the products that were sold in plaintiff's territory prior to the effective date of the termination of the various agreements. Under the holding of the Supreme Court of Arkansas in White Sewing Machine Company v. Shaddock, supra, and Addressograph Company v. Office Appliance Company, 106 Ark. 536, 153 S.W. 804, as well as many other authorities, the defendant is liable to the plaintiff for the profit that it would have made on the sale of the 369 cases at 25¢ per case, or $92.25.

The plaintiff, however, admits that it is indebted to the defendant for goods purchased and not paid for prior to the termination of the various agreements in the sum of $165.64 and, after adjusting these accounts, the plaintiff is indebted to the defendant on its counterclaim in the sum of $73.39.

The real complaint of the plaintiff is to the effect that the defendant should not be allowed to terminate the agreements without showing a prior breach of the terms of the agreements by the plaintiff. In other words, the plaintiff contends that it expended large sums of money preparing to perform the obligations of the contracts assumed by it; that it was acting in good faith and that the defendant should not have the right to terminate the contract and agreements without reimbursing it for the expenditures that it had made in performing the contract prior to the effective date of the terminations. In answer to such contentions, the words of Judge Sanborn in the opinion of the court in the case of E. I. DuPont De Nemours & Company v. Claiborne-Reno Company, 8 Cir., 64 F.2d 224, Loc. Cit. 233, 89 A.L.R. 238, are particularly appropriate. He said: "It seems fair that, after having spent six years in developing the territory assigned to it, the Reno Company should have been permitted to continue or should have been compensated for the injury done it by having its business taken away. However, the injury done to the Reno Company was one against which its contract, rather obviously, did not afford protection. As was said by Judge Stone in the Woerheide Case [Woerheide v. Barber Asphalt Paving Co., 8 Cir., 251 F. 196] (page 204 of 251F.): 'The entire trouble is found in the contract itself. It was not at its making strong enough to hold.'"

Under the undisputed and admitted facts, the defendant is not liable to the plaintiff

982

by reason of its exercise of the right to terminate the distributorship contract and the licensing agreements and is entitled to recover on its counterclaim of $165.64, less the damage suffered by the plaintiff in the sum of $92.25 prior to the effective date of the termination of the contract and licensing agreements, and judgment, sustaining the motion for summary judgment and for the recovery of $73.39 by the defendant, is being entered today.