**D. W. SHULL, sole surviving partner of the firm of W. R. Pate and D. W. Shull, d/b/a Russellville Feed Company, Plaintiff,**

v.

**PRIEBE & SONS, INC., Defendant.**

**Civ. A. No. 1393.**

United States District Court
W. D. Arkansas,
Fort Smith Division.

Feb. 20, 1959.

Williams & Gardner, Russellville, Ark., for plaintiff.

James A. Gilker, Heilbron & Shaw and John G. Holland, Fort Smith, Ark., for defendant.

JOHN E. MILLER, Chief Judge.

On December 31, 1957, W. R. Pate and D. W. Shull, partners, doing business as Russellville Feed Company, filed their complaint against defendant, Priebe & Sons, Inc., in which they alleged that they are citizens of Arkansas and reside in the City of Russellville, Pope County, Arkansas; that the defendant is a corporation, organized under the laws of the State of Delaware and authorized to do business in the State of Arkansas and maintains a place of business in the City of Clarksville, Johnson County, Arkansas.

That the plaintiffs, from the 6th day of December 1955 to the 3rd day of October 1956, were engaged at Russellville, Arkansas, in selling poultry feed to broiler growers in Pope and Yell Counties as the exclusive agent and representative of Swift & Company; that on the 3rd day of October 1956 the plaintiffs, pursuant to an agreement entered into between them and the defendant, relinquished their agency with Swift & Company and devoted their efforts to obtaining broiler growers who agreed to use chickens and feed sold by the defendant; that the defendant orally agreed that it would furnish and finance at least 500,000 chickens to growers to be obtained by plaintiffs, and would pay plaintiffs as compensation for their work one cent per chicken so placed with the growers.

That immediately after entering into said agreement, the plaintiffs obtained and placed 45,100 chickens with growers which were accepted by defendant, and plaintiffs were paid by defendant the agreed compensation of one cent per chicken for such work.

That as of October 18, 1956, plaintiffs had obtained agreements from other growers for placement of an additional 88,500 chickens, but that on that date the defendant without cause refused to continue to accept broiler growers submitted by plaintiffs, and, therefore, breached the contract between plaintiffs and defendant.

That plaintiffs on the 18th day of October 1956 and at all times since have been ready, willing and able to obtain many additional broiler growers in accordance with the contract entered into between them and the defendant, but defendant has continued and now continues to refuse to recognize and comply with the contract.

As a result of the alleged breach of the contract by defendant, the plaintiffs alleged that they were forced out of the feed business and have been damaged to the extent of $10,000. Plaintiffs further alleged that they would have been able within a period of one month from the date of the alleged contract with defendant to place 500,000 chickens per growing period, which in the course of one year would have totaled two million chickens and that within said year they would have earned $20,000 but for the breach by defendant of the alleged contract.

In due time the defendant filed its answer in which it denied all the material allegations of the complaint, and in addition to the denial of the allegations of the complaint alleged that "about the middle of October, 1956, plaintiffs and defendant entered into an oral agreement whereby said plaintiffs agreed to arrange for the placement of 45,100 chickens with growers which were acceptable to the defendant and said defendant agreed to pay to said plaintiffs the sum of one cent (1¢) per chicken for said plaintiffs' services; that thereafter said plaintiffs did make arrangements for the placement of 45,100 chickens with growers which were

acceptable by said defendant and said defendant did pay to said plaintiffs the sum of one cent (1¢) per chicken for the services of said plaintiffs."

The prayer of the answer was that the complaint of plaintiffs be dismissed, and that defendant recover its costs.

On October 29, 1958, W. R. Pate, one of the original plaintiffs, died, leaving as sole surviving partner the plaintiff, D. W. Shull, and on December 15, 1958, the court entered an order permitting the cause to proceed in the name of the present plaintiff, D. W. Shull, surviving partner of the firm of W. R. Pate & D. W. Shull, doing business as Russellville Feed Company.

The case came on for trial on January 21, 1959, to the court without a jury, and at the conclusion of the trial the case was submitted and taken under consideration, subject to the filing and service by the parties herein of written briefs in support of their respective contentions. The briefs have been received, and considered along with all of the ore tenus testimony, the depositions, and exhibits thereto, and the court now makes and files herein its formal findings of fact and conclusions of law, separately stated.

### Findings of Fact

#### 1.

The plaintiff, D. W. Shull, is a citizen of Arkansas and resides in Pope County within the Western District of Arkansas.

The defendant is a corporation organized and existing under the laws of the State of Delaware and is authorized to engage in business in the State of Arkansas, and has and maintains a place of business in the City of Clarksville in Johnson County, Arkansas, within the territorial limits of the Western District of Arkansas.

The amount involved herein exceeds $3,000, exclusive of interest and costs.

#### 2.

On or about December 1, 1955, D. W. Shull and W. R. Pate formed a partnership under the name of Russellville Feed Company. Prior to forming a partnership, they had contacted Swift & Company of Memphis, Tennessee, and were advised of prices of poultry feed, medicines, and also dairy and other livestock feed, and Swift & Company agreed to sell exclusively to plaintiffs in the territory in which they were to operate their business as the Russellville Feed Company.

The plaintiffs immediately purchased a carload of poultry feed and possibly some dairy feed and stored it in their place of business at Russellville, Arkansas. Then, beginning about January 1, 1956, the plaintiffs proceeded to enter into contracts with various poultry growers in Pope County, Arkansas, by the terms of which plaintiffs were to finance the growers in the placing, growing, and marketing of broiler chickens. Plaintiffs were to furnish or purchase for the growers the baby chicks, furnish medication, supervision, and feed necessary to develop the chicks into broilers within the usual period of from 8 to 10 weeks.

In the interim between the date of the organization of the partnership and the first half of January, 1956, plaintiffs and Swift & Company after further discussion agreed that plaintiffs would purchase all of the feed and medication from Swift & Company, and, as an inducement for credit for the feed and medication, would make reports to that company of the progress of the various flocks of chickens, and when the chickens were ready for market, they were to be sold either by a representative of Swift & Company or by the plaintiffs, or both, and the proceeds sent to the Memphis office. Upon receipt of the proceeds of the sale of the chickens, Swift & Company would pay itself the amount due for feed and medication which the plaintiffs had purchased and furnished the individual growers, and would send its check to plaintiffs for one cent per pound of the chickens produced as a commission for the handling of the feed and for plaintiffs' service to the growers. The remainder of the sale price was transmitted by Swift & Company usually through the plaintiffs to the individual growers.

The plaintiffs operated under that plan until July 1956, when other arrangements were made by the plaintiffs and Swift & Company. Under the second arrangement, known in the broiler business as the "Broiler Encouragement Plan," Swift & Company agreed to finance each individual grower and guarantee the grower a minimum of five cents per head for each broiler marketed. The plaintiffs were to be paid $5 per ton for warehousing and delivering feed to the individual broiler projects which Swift & Company accepted and agreed to finance. Under this arrangement, the plaintiffs would contact the various growers and report their names and a description of the facilities to Swift & Company. If Swift & Company approved of the grower and the facilities available for producing broilers, a contract was signed by the grower, Swift & Company, and the plaintiffs. Swift would proceed to furnish or cause to be furnished to the grower the chicks at a certain price, and the grower was required to use Swift's feed and medication. The feed, medication and cost of the chicks were charged by Swift to the individual grower, and the plaintiffs assumed the obligation of warehousing the feed and delivering it to the growers as and when needed. At that time Swift & Company had an insurance policy which provided for reimbursing it for eighty percent of any losses that it might suffer by reason of the financing of the individual growers.

This financing arrangement continued until in September 1956, when a representative of Swift & Company advised plaintiffs that it would not continue financing the individual growers because its insurer had canceled the policy under which it was protected to the extent of eighty percent of any losses.

On September 17, Mr. Pate, on behalf of the partnership, Russellville Feed Company, wrote Swift & Company as follows:

"In accordance with instructions over the phone from Mr. Pearson, we are not soliciting new business until you people have worked out a new deal for broiler growers and the supplying dealers.

"We are moving several thousand birds to the processing plants this week, and the growers wish to refill their houses with day-old birds as soon as possible. Up to now it has not been necessary for us to mention specifically that Swift is making a change. Most growers are conscious of some changes in the industry, through grapevine news, that are prompted by the current low price for broilers.

"In order for us to avoid embarrassment with our good growers which we wish to keep, it is imperative that Swift make all haste and get information to us concerning your new plan. If we cannot sign up our good growers by the end of this week, then we lose them.

"At present we are only stocking enough feed to finish out the birds now in the remaining growers' houses. If you do not have a workable deal for us shortly, then our only alternative is to dissolve the Russellville Feed Company when the above mentioned birds are fed out.

"We prefer to stay in business and are depending on your guidance.

"Kindly reply at your earliest convenience or phone us collect."

Swift & Company did not submit any other plan, and the relationship between plaintiffs and Swift & Company was terminated insofar as future broiler projects were concerned on the approximate date of Mr. Pate's letter of September 17. At that time 34,775 chickens were being financed and grown by four or five individual growers. The projects were completed, and the chickens were sold in October, and upon the sale or closing of the then projects all relationships between Swift & Company and the plaintiffs ceased.

3.

Immediately upon receiving information from Swift & Company that it would not continue to finance the individual

growers, the plaintiffs decided that they would not undertake to finance growers, and they began contacting other feed companies in an effort to obtain a connection under which they would be able to sell feed to growers if such company would agree to finance the growers. The plaintiff, D. W. Shull, contacted Mr. John E. Chamberlain, manager of the defendant, at his office in Clarksville, on September 24, 1956. In the conversation with Mr. Chamberlain, Mr. Shull stated that he and Mr. Pate desired to obtain growers to be financed by the defendant, and represented that they had certain growers that were at that time depending upon them to make arrangements for their continuing in the broiler business. It so happened that the defendant had or would have available a sufficient number of chicks for delivery in a few days to the growers in which plaintiffs were then interested, and agreed to furnish the chicks and finance such growers as it might approve and which had been financed by Swift. As compensation to the plaintiffs, defendant agreed to pay the plaintiffs one cent per chicken for all chickens placed in projects accepted by defendant. Between October 1 and 5, 1956, plaintiffs submitted to the defendant the names of five growers—W. F. Wortham, 5,000 chicks; John McMillan, 10,000 chicks; Floyd Blankenship, 12,-300 chicks; Mr. Erickson, 10,000 chicks; and Mr. Shull, 7,500 chicks. These growers were investigated by the defendant, and it agreed to finance said growers and to pay the plaintiffs one cent per head for the chickens placed with such growers. Soon after defendant accepted the proffered growers, they were able to dispose of their then growing flocks, and the defendant proceeded to furnish them with the number of chickens desired between the dates of October 6 and November 20, 1956. The defendant paid plaintiffs the amount it agreed to pay for the chickens of those growers whose projects were accepted by defendant. Following the acceptance by defendant of the growers above named, Mr. Shull began going to various other growers in Pope and Yell Counties in an effort to persuade them to abandon their connections with other feed companies and to enter into finance agreements with the defendant. The defendant received complaints from persons in Pope and Yell Counties concerning the activities of the plaintiffs, and as a result thereof, on October 18, 1956, defendant advised plaintiffs that it would not accept any other growers through them other than the ones already accepted as above set forth, and thus the relationship between the defendant and plaintiffs was terminated, and defendant accepted no other broiler projects although plaintiffs, a few days after the termination of the relationship between them and the defendant, advised defendant that they had several other growers for submission. Among the other growers that plaintiffs had for submission were three that had formerly been financed by Swift & Company. Those three growers were prepared to grow a total of 31,000 chicks.

The only compensation plaintiffs were to receive under their agreement with the defendant was the one cent per chicken, and it is agreed that the defendant retained the right to accept or reject any grower that might be submitted. There was no agreement between plaintiffs and defendant as to how long the relationship would continue nor the number of chickens or number of growers that the defendant would accept for financing. In other words, there was no agreement on the part of the defendant that it would continue to accept any grower that might be submitted by plaintiffs other than the ones that it had accepted prior to October 18, 1956. The testimony does not show that the agreement between plaintiffs and defendant was to continue for any definite period of time or that defendant was obligated to accept any chickens or any grower other than those that it desired to accept, or that plaintiffs were obligated to submit at any time any other growers.

It developed that complaints were made to defendant about the activities of plaintiffs by other persons with whom

the defendant had business connections, and the relationship between plaintiffs and defendant terminated.

### 4.

The closing of the feed business by plaintiffs was caused by the termination of the arrangement between them and Swift & Company, and not by any action on the part of the defendant. The defendant paid to plaintiffs all amounts due on the projects that it accepted.

The plaintiffs had made no profit in the operation of their feed business, but did have approximately $790 of accounts receivable over and above the indebtedness of the partnership on the date the feed business was closed in December 1956.

The negotiations between plaintiffs and the defendant were instituted by plaintiffs in an effort to make some arrangement whereby they might continue in business, but plaintiffs were not authorized to sell any feed or render any services to either the defendant or the growers on the projects that it did accept, and their sole compensation depended upon the number of chicks to be grown by the individual growers which defendant accepted. There is not any contention on the part of the plaintiffs that the arrangement was to continue for any definite period of time. Neither did plaintiffs agree to furnish any specified number of growers or number of chickens, and the defendant did not agree to accept any definite number of growers or chickens at any time other than the ones that it accepted prior to the date that it terminated the contract. The plaintiffs were not obligated to do anything. The defendant did all it agreed to do.

### Conclusions of Law

#### 1.

The court has jurisdiction of the parties and the subject matter herein.

#### 2.

Under the facts as found by the court, the plaintiff, as the surviving partner, is not entitled to recover. The agreement or conversation between the plaintiffs and the defendant did not obligate the plaintiffs or the defendant to do anything other than what the plaintiff admits has been fully performed.

If in fact any agreement existed, as contended by plaintiffs, it was void for lack of mutuality.

In Harrison v. Kelly, 212 Ark. 447, at page 449, 206 S.W.2d 184, at page 185, the court said:

"The applicable legal principle is elementary. A party who has the option to perform cannot insist that the other party shall do so. Where it appears that one party was never bound on his part to do the act which forms the consideration for the promise of the other, the agreement is void for the lack of mutuality."

In Duclos v. Turner, 204 Ark. 1000, at page 1006, 166 S.W.2d 251, at page 253, the Supreme Court of Arkansas, in approving the rule announced in the case of El Dorado Ice & Planing Mill Co. v. Kinard, 96 Ark. 184, 132 S.W. 460, said:

"A contract which leaves it entirely optional with one of the parties as to whether or not he will perform his promise is not binding upon the other."

In Spur Bottling Co. v. Canada Dry Ginger Ale, D.C.W.D.Ark.1951, 98 F. Supp. 972, 978, the court quoted from 17 C.J.S. Contracts § 404, p. 893, as follows:

"'Where under the contract a party may terminate it at his option, he is not liable after termination for further transactions thereunder, but obligations which have already accrued are not affected.'"

#### 3.

A judgment dismissing the complaint of the plaintiff and requiring the parties to pay their own costs is being entered today.